UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEVONTA MACDONALD, | No.  2:22-cv-0742 TLN KJN P |
| Petitioner, | |
| v. | <u>ORDER &</u> |
| JEFF LYNCH, | <u>FINDINGS & RECOMMENDATIONS</u> |
| Respondent. | |

I. <u>Introduction</u>

Petitioner is a state prisoner, proceeding with counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his June 2018 conviction for attempted murder, conspiracy to commit murder, assault with a firearm, and possession of a firearm by a person previously convicted of a felony, with enhancements for personal infliction of great bodily injury and personal use of a firearm.  Petitioner was sentenced to a determinate term of four years and an indeterminate term of 39 years to life in state prison.  In his habeas petition, petitioner claims that the trial court erred in instructing the jury to consider the degree of certainty of eyewitness identification.  After careful review of the record, this Court concludes that the petition should be denied and orders that petitioner's request for judicial notice be denied as moot.  (ECF No. 1.)

////

1

II. Procedural History

On June 28, 2018, a jury found petitioner guilty of attempted murder, conspiracy to commit murder, assault with a firearm, and possession of a firearm by a person previously convicted of a felony, with enhancements for personal infliction of great bodily injury, personal use of a firearm, and a prior strike from a juvenile adjudication. The trial court sentenced petitioner to four years and an indeterminate term of 39 years to life in state prison.

Petitioner appealed the conviction to the California Court of Appeal, Third Appellate District. On February 22, 2021, the Court of Appeal accepted the parties' concession that petitioner should receive two additional days of presentence custody credit, but otherwise affirmed the judgment. (ECF No. 9-15.) Petitioner filed a petition for review in the California Supreme Court, which was denied on May 12, 2021. (ECF No. 9-17.)

Petitioner filed the instant petition on May 5, 2022. (ECF No. 1.) Respondent filed an answer. (ECF No. 11.) Petitioner filed a traverse. (ECF No. 12.)

III. Facts[1]

After independently reviewing the record, this Court finds the appellate court's summary accurate and adopts it herein. In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> ***A. The Shooting***
>
> The victim, Terrell, moved from Alabama to Sacramento in September 2016. He met Gibson and began a dating relationship with her a short time later. Terrell understood that MacDonald was Gibson's ex-boyfriend. MacDonald received mail at Gibson's house and called from time to time. But Terrell never laid eyes on MacDonald and never even saw a photograph of him.
>
> That changed one day in late October or early November 2016, as Gibson and Terrell were preparing to leave Gibson's house. The couple was backing out of the driveway in Gibson's car when MacDonald appeared, blocked the driveway and approached the car, demanding to know, "'What you got going on? Just what you doing?

---

[1] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Gibson, No. C089393, 2021 WL 671745 (Cal. Ct. App. Feb. 22, 2021), a copy of which respondent lodged as ECF No. 9-15.

2

Who is this?'" Gibson drove away, but MacDonald followed in his car.

Gibson spoke to MacDonald by phone as she drove. She warned MacDonald to stop following her or she would shoot. She then produced a .40 caliber Smith & Wesson handgun from her purse. She cocked the gun as she drove. MacDonald gave up the chase and Gibson and Terrell continued on their way. During the trial, Terrell testified that Gibson owned two guns and always carried the loaded .40 caliber Smith & Wesson in her purse.

Terrell went to Alabama for several weeks in December 2016. He returned to Sacramento in January 2017. He took up residence with Gibson, but things were not the same. Gibson was still receiving MacDonald's mail and speaking with him regularly by phone, just as she had done before Terrell went to Alabama. Only now, Terrell began to suspect that Gibson might be cheating on him.

Terrell was hoping to enjoy a romantic evening with Gibson on February 6, 2017. But Gibson came home later than expected and then announced that she was going out with a friend. Disappointed, Terrell went for a short walk. When he returned, Gibson's friend was there. An argument ensued. During the course of the argument, Terrell climbed into the passenger's seat of Gibson's parked car, as if to accompany her. Gibson tried to pull Terrell out of the car. Terrell resisted. Gibson scratched Terrell's face in the tussle.

Gibson told Terrell he needed to leave the house. Terrell agreed and began collecting his belongings. As Terrell was packing to leave, Gibson asked that he return her car keys. Terrell responded that he did not have them. However, Terrell forgot that he had taken the keys and put them in the pocket of some work clothes. It was only later, after the events described below, that Terrell discovered the keys in his pocket.

Terrell left Gibson's house and went to the home of a nearby relative. Over the course of the evening, Gibson called Terrell several times and sent several text messages, all demanding the return of her keys. Gibson also called 911 and reported that Terrell had taken her keys. Sacramento Police Officer Jeffrey Daigle called Terrell to ask about the keys. Terrell insisted, again, that he did not have them.

Gibson appeared at the home of Terrell's relative sometime later. Gibson honked her horn, banged on the security gate, and threw a garbage can, all the while yelling about the keys. Gibson later contacted Terrell's relative by text, stating that she knew the route Terrell took to work, and was going to "'get him and mess him up.'"

Terrell went to work that night, completed his shift, and returned to his relative's house. During this time, he exchanged numerous text messages with Gibson regarding the missing car keys and other personal belongings. It was clear to Terrell by now that the relationship with Gibson was over, and his belongings were probably gone for good.

Terrell went to the store for cigarettes on the evening of February 7, 2017. He then walked back to his relative's house. He chose a route that would take him past Gibson's house, thinking he might knock on her door and ask for his things. As he walked along a frontage street near Gibson's house, he saw a car approaching. He recognized the car as Gibson's. The car pulled up next to Terrell, and Terrell approached the driver's side. The driver's side window rolled down, and Terrell saw a man's face. Terrell did not immediately recognize the face and turned to walk away. As he did so, however, he saw Gibson lean forward from the passenger's seat, so that her head was visible on the far side of the male driver. Terrell saw the man turn towards Gibson. He then saw Gibson nodding her head. The man reached for something with his right hand. The man then turned to face Terrell. Terrell, upon seeing the man's face again, now recognized him as MacDonald. Terrell then saw Gibson's .40 caliber Smith & Wesson in the man's hand.

MacDonald pointed the gun at Terrell and started firing. Terrell was shot in the stomach, thigh, and forearm from a distance of approximately 15 feet. The car sped away. Terrell managed to get up and began limping down the street. Within seconds, however, Terrell saw the car reverse and return to his location. Terrell was then shot four more times; once in the buttocks, twice in the thigh, and once in the hand. Terrell was not able to see who shot him the second time, as his back was turned and he was trying to get away. The car then drove away a second time, leaving Terrell bleeding in the street.

Terrell managed to stand again and started staggering towards his relative's house. He soon collapsed, however. Neighbors called 911 and came to Terrell's aid. Terrell told them, "Brittany Gibson and her boyfriend just shot me." Terrell called his relative and told her the same thing.

Officer Daigle arrived on the scene and found Terrell lying face down on the ground. Terrell was lucid and told Daigle that Gibson and her ex-boyfriend pulled up alongside him, and the ex-boyfriend starting shooting. Daigle ran Gibson's name and learned that she was the registered owner of two guns, including the .40 caliber Smith & Wesson. Daigle also learned that MacDonald was on probation and used Gibson's address as his residence.

After the shooting, MacDonald and Gibson parked the car and made their way to the apartment of MacDonald's sister. They returned to their parked car several hours later. Police, who had been surveilling the car, followed MacDonald and Gibson to a gas station, where they were placed under arrest. A video camera captured them kissing in the backseat of the patrol car.

Terrell was transported to the hospital, where he was treated for multiple gunshot wounds. Police visited Terrell in the hospital early the next morning. Terrell readily identified MacDonald from a six-pack photo lineup.[2] Terrell remained in the hospital for some weeks, undergoing a blood transfusion and surgery to repair damage to his intestines.

4

[N.2 Officer Jonathan Monroe of the Sacramento Police Department testified that Terrell identified MacDonald from the six-pack photo lineup within two seconds.]

**B. The Charges and Jury Trial**

MacDonald and Gibson were charged by amended information with attempted murder (§§ 664, 187, subd. (a)—count one), conspiracy to commit murder (§ 182, subd. (a)(1)—count two), and assault with a firearm (§ 245, subd. (a)(2)—count three). MacDonald was also charged with possession of a firearm by a felon (§ 29800, subd. (a)(1)—count four). The information further alleged that the attempted murder was committed willfully, deliberately, and with premeditation (§ 664, subd. (a)), and that Gibson, a principal in the offense, was armed with a firearm (§ 12022, subd. (a)(1)) and MacDonald personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm causing great bodily injury or death. (§ 12022.53, subds. (b)-(d).) The information further alleged that MacDonald had a prior serious felony conviction. (§§ 667, subds. (b)-(i), 1170.12.) MacDonald and Gibson pled not guilty and denied the allegations.

The matter was tried to a jury in June 2018. The prosecution's witnesses testified substantially as described *ante*. Gibson testified in her own defense. Gibson explained that she owned two guns, which she kept for self-defense. She recalled that she began dating MacDonald in 2015. According to Gibson, MacDonald was abusive and occasionally violent. Gibson testified that she was afraid of him.

Gibson recalled that MacDonald was in custody when she met Terrell in September 2016. Gibson acknowledged that she remained in regular contact with MacDonald, even after she started dating Terrell. Gibson testified that MacDonald was released from custody in October 2016, and he regularly stopped by her house to collect his mail. She explained that MacDonald and Terrell encountered one another in front of her house on several occasions, most of them contentious. She remembered one incident in which MacDonald blocked her driveway, and another in which MacDonald followed Gibson and Terrell as she spoke with him by phone. However, she denied threatening to shoot MacDonald, or driving with a cocked gun.

Gibson acknowledged arguing with Terrell on February 6, 2016. She confirmed that Terrell agreed to leave and eventually decamped to his relative's house. She also confirmed that there was an extended back and forth regarding the whereabouts of her car keys. She explained that she retrieved a spare set of keys from her grandparents and then drove to the home of Terrell's relative, where she merely honked her horn. She denied getting out of the car or throwing a garbage can.

Gibson, a nursing student, explained that she had clinical rotations in Grass Valley on February 7, 2016. She was planning to spend the night in Grass Valley and asked MacDonald to accompany her. MacDonald agreed and went to Gibson's house. Gibson was out, but

told MacDonald to let himself into the house with a key that she kept outside. Gibson returned to the house shortly thereafter. MacDonald and Gibson were sexually intimate and then left for Grass Valley at 3:00 a.m. Gibson attended her clinical rotations in Grass Valley. When she was done, she and MacDonald decided to return to Sacramento rather than spend the night in Grass Valley.

Gibson and MacDonald arrived in Sacramento on the afternoon of February 7, 2016. They ran some errands. Gibson testified that she did not have her gun and did not know that MacDonald had a gun. According to Gibson, MacDonald was driving back to her house, and she was reclining in the passenger seat with her eyes closed. She sensed the car slowing down and assumed they were pulling up to her house. In Gibson's version of events, she heard the driver's side window descend and sat up in time to see MacDonald firing at someone. She recognized Terrell as the target within the first few shots.

Gibson testified that she tried to grab MacDonald's arm, but he threw her off and continued firing. She said she then tried to open the passenger's side door to leave but was unable to do so because MacDonald was driving too quickly. She said she then attempted to call 911 but was unable to complete the call because MacDonald grabbed her phone.

After the shooting, MacDonald drove to an apartment complex and parked the car. According to Gibson, MacDonald threatened to harm her and instructed her to keep her mouth shut. Gibson explained that MacDonald still had her gun and phone, and she was afraid of what he might do. MacDonald and Gibson then went across the street to the apartment of one of MacDonald's girlfriends or ex-girlfriends. MacDonald took a shower. He then used Gibson's phone to arrange for a ride to his sister's apartment. Gibson did not try to leave the apartment or summon help while MacDonald was showering.

Gibson and MacDonald then went to MacDonald's sister's apartment. They spent several hours there, during which time, Gibson briefly fell asleep. MacDonald woke Gibson at approximately 10:00 p.m. so she could watch a television news report about the shooting. As before, Gibson did not try to leave MacDonald or call police. MacDonald's sister then drove Gibson and MacDonald to Gibson's house. Gibson went into the house by herself to retrieve some things for nursing school. Once again, she made no attempt to call police or summon help.

Gibson, MacDonald, and MacDonald's sister then made their way to the parking lot where Gibson's car was parked. Gibson and MacDonald were arrested a short time later. According to Gibson, MacDonald instructed her to say nothing to police as they sat in the backseat of the patrol car.

Gibson was questioned by police a short time later. She initially told police she had no idea why she had even been pulled over. She then told police she kept her guns in a cabinet in the garage. When a probation search of her house failed to uncover the guns, Gibson told

6

police they had been stolen. She did not tell police that MacDonald had taken her guns or used her .40 caliber Smith & Wesson to shoot Terrell. On cross-examination, Gibson admitted lying to police.

Gibson continued to communicate with MacDonald after she was released from jail, while he remained in custody. Among other things, Gibson sent MacDonald emails professing her love, raising the possibility of marriage, and opining that she might not qualify for a nursing license with a felony conviction.

Gibson testified that MacDonald repeatedly threatened her—after the shooting, at the time of their arrest, and thereafter—warning her to "stay loyal" and intimating that he might hurt her if she failed to do so. Gibson also claimed that MacDonald suggested they get married so she would be unable to testify against him.

Psychologist Geoffrey Loftus, Ph.D., testified as an expert on eyewitness identification, memory, and perception. Dr. Loftus explained that several factors may affect the accuracy of a witness's memory. The duration of the event, stressfulness of the event, and quality of lighting can affect a person's ability to receive information and undermine the accuracy of an eyewitness identification. The presence of a weapon can also undermine the accuracy of an eyewitness identification, as people tend to focus on the weapon, rather than the person holding it.

Dr. Loftus emphasized that witnesses may unconsciously rely on "pre[-]event information" and "post[-]event information" to supplement their memories of actual events and may honestly and confidently believe that they remember things that are not based on their actual experiences. As a result, Dr. Loftus explained, "a witness can provide a very confident account of anything, including the identity of somebody who they saw commit a crime and yet potentially be wrong." Based on a hypothetical with facts similar to the present case, Dr. Loftus opined that the eyewitness identification of a person shot multiple times from a car at a distance of 15 feet, in the dark, would not be "super reliable," even though the person might have a high degree of confidence in the identification.

### *C. Verdict and Sentencing*

The jury found MacDonald and Gibson guilty as charged. The trial court sentenced Gibson to an indeterminate term of 25 years to life for the conspiracy to commit murder charged in count two (§ 182, subd. (a)(1)), stayed the sentence on the remaining counts, and imposed various fines and fees.

In a bifurcated proceeding, the trial court found true the allegation that MacDonald had a prior serious felony conviction. The trial court granted MacDonald's motion to strike the prior serious felony conviction pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*) in part, striking the conviction for purposes of sentencing under count two only. The trial court then sentenced MacDonald to an indeterminate term of 39 years to life for count one (seven years to life, doubled for the strike, plus 25 years for the

enhancements), followed by a consecutive determinate term of four years for being a felon in possession of a firearm. The trial court imposed an indeterminate sentence of 25 years to life for count two, and a determinate sentence of two years for count three (assault with a firearm), but stayed the sentence on both counts pursuant to section 654. The trial court also imposed various fines and fees.

(ECF No. 9-15 at 3-10.)

IV. Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established Federal law" consists of holdings of the Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may

8

not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id. Further, where courts of appeals have diverged in their treatment of an issue, there is no "clearly established federal law" governing that issue. See Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case."[2] Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); see also Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a '"firm conviction"' that the state court was '"erroneous"'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus

---

[2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

9

from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Id. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100. Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 298-301 (2013) (citing Richter, 562 U.S. at 98). If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court. See, e.g., Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v.

Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court reviews the state court record to "determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 101. It remains the petitioner's burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860 (citing Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006)).

V.   Petitioner's Claim

    A.   Claim One: Jury Instructional Error

Petitioner sole claim for habeas relief is that the trial court erred in instructing the jury in CALCRIM No. 315 that "it was to consider the degree of certainty of an eyewitness' identification in determining whether it was accurate where the clear scientific consensus is that there is no positive correlation between certainty and accuracy." (ECF No. 1 at 36, 45-50.) He claims that this instruction reduced the prosecution's burden of proving his guilt beyond a reasonable doubt "especially where the prosecutor relied on Plaines' confidence in his identification heavily in closing and rebuttal and stressed that it conclusively established Petitioner's guilt." (Id. at 48.) In response, respondent argues that petitioner is not entitled to

11

relief on his claim that the trial court violated his due process rights by instructing the jury with CALCRIM No. 315. (ECF No. 11 at 15-23.)

As background, the trial court instructed the jury on CALCRIM No. 315 as follows:

> You have heard eyewitness testimony identifying the defendants. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.
>
> In evaluating identification testimony, consider the following questions:
>
> - Did the witness know or have contact with the defendant before the event?
> - How well could the witness see the perpetrator?
> - What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation.
> - How closely was the witness paying attention?
> - Was the witness under stress when he or she made the observation?
> - Did the witness give a description and how does that description compare to the defendant?
> - How much time passed between the event and the time when the witness identified the defendant?
> - Was the witness asked to pick the perpetrator out of a group?
> - Did the witness ever fail to identify the defendant?
> - Did the witness ever change his or her mind about the identification?
> - How certain was the witness when he or she made an identification?
> - Are the witness and the defendant of different races?
> - Was the witness able to identify other participants in the crime?
> - Was the witness able to identify the defendant in a photographic or physical lineup?
> - Were there any other circumstances affecting the witness's ability to make an accurate identification?
>
> The People have the burden of proving beyond a reasonable doubt

that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty.

(ECF No. 9-2 at 49-50.)

In the last well-reasoned opinion, the state court evaluated and rejected petitioner's claim:

> MacDonald argues the trial court violated his constitutional rights by instructing jurors with CALCRIM No. 315, the standard instruction on eyewitness identification. CALCRIM No. 315 instructs the jury to consider various questions in deciding whether an eyewitness "gave truthful and accurate testimony," including, "How certain was the witness when he or she made an identification?" MacDonald argues this portion of the instruction runs counter to scientific studies showing that witness certainty does not correlate with accuracy, and consequently deprived him of due process and a fair trial.
>
> Our Supreme Court has repeatedly approved similar language in CALJIC No. 2.92, the virtually identical predecessor to CALCRIM No. 315. (See *People v. Sañchez* (2016) 63 Cal.4th 411, 461-462 (*Sañchez*); *People v. Johnson* (1992) 3 Cal.4th 1183, 1230-1232 (*Johnson*); see also *People v. Wright* (1988) 45 Cal.3d 1126, 1143-1144 (*Wright*).) In *Johnson*, the trial court instructed the jury with a modified version of CALJIC No. 2.92, which urged jurors to consider "[t]he extent to which the witness was either certain or uncertain of the identification." (*Johnson, supra,* at p. 1230, fn. 12.) There, as here, the defendant argued the trial court erred in permitting the jury to consider the certainty of a witness's identification because an expert had testified, without contradiction, that "confidence in an identification does not positively correlate with its accuracy." (*Id.* at p. 1231.) The Supreme Court disagreed, finding no error. (*Id.* at p. 1232; see also *Wright, supra,* at pp. 1138-1144 [approving CALJIC No. 2.92].)
>
> In *Sañchez,* another case involving CALJIC No. 2.92, the jury was similarly instructed to consider a witness's certainty in making an identification. (*Sañchez, supra,* 63 Cal.4th at p. 461.) On appeal, the defendant relied upon "scientific studies that conclude there is, at best, a weak correlation between witness certainty and accuracy," and argued the trial court "erred in instructing the jury it could consider the certainty factor." (*Ibid.*) The Supreme Court concluded the defendant forfeited the claim by failing to request modification of the instruction. (*Ibid*.) But the court considered the merits anyway, concluding there was no error in giving the instruction, and no prejudice in any event. (*Id.* at p. 462.) The court observed that studies suggesting a weak correlation between witness certainty and accuracy were "nothing new," adding that *Wright* "specifically approved CALJIC No. 2.92, including its certainty factor," and *Johnson* "reiterated the propriety of including this factor." (*Ibid.*) The court declined to reconsider the propriety of these previous holdings. (*Ibid.*)
>
> Our Supreme Court is currently considering whether the certainty factor as articulated in CALCRIM No. 315 remains valid.

13

> (See *People v. Lemck* (June 21, 2018, G054241) [nonpub. opn.] review granted Oct. 10, 2018, S250108.) MacDonald urges us to anticipate the Supreme Court's overruling of *Sañchez* by concluding that CALCRIM No. 315 improperly encourages jurors to consider witness certainty in evaluating identification testimony. *Sañchez,* however, remains good law. Unless and until the Supreme Court overrules or modifies *Sañchez,* we are bound by its holding that including the certainty factor was not improper. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)
>
> But even assuming the Supreme Court reverses course and determines the instruction was erroneous, any such error was harmless. (See *Sañchez, supra,* 63 Cal.4th at p. 463; *Wright, supra,* 45 Cal.3d at p. 1144 [analyzing instructional error under the *Watson* harmless error standard].)³ The problem for MacDonald was that he was not a stranger to Terrell. Although Terrell did not immediately recognize MacDonald, he soon placed him as Gibson's boyfriend or ex-boyfriend and identified him as such to bystanders, his relative, and police. Moreover, Terrell's identification of MacDonald was corroborated by Gibson, who likewise identified MacDonald as the shooter, and further testified that they went to the homes of MacDonald's girlfriend or ex-girlfriend and sister after the shooting. On the record before us, we perceive no reasonable probability that MacDonald would have obtained a more favorable result had CALCRIM No. 315 been modified to omit the certainty factor. (See *Sañchez, supra,* 63 Cal.4th at p. 463; *Wright, supra,* 45 Cal.3d at p. 1144-1145.) We therefore reject MacDonald's claim of instructional error.
>
> [N.3 *People v. Watson* (1956) 46 Cal.2d 818, 836.]

(ECF No. 9-15 at 11-13.)

Petitioner argues that the trial court erred by instructing the jury in CALCRIM No. 315 that it was allowed to consider witnesses' certainty in identifying the perpetrator. He claims that certainty does not correlate to the accuracy of the identification. To the extent petitioner claims that CALCRIM No. 315 is inconsistent with state law, this claim is not cognizable on habeas review. Federal habeas corpus relief is only available for violations of federal law. See Wilson, 562 U.S. at 5; Estelle, 502 U.S. at 71-72. This Court must defer to the state court's finding that there was no error under state law. Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam).

Petitioner also raises a due process challenge to CALCRIM No. 315's certainty factor, but this argument fares no better. Federal habeas relief for a jury instruction claim is only available if "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)); see

14

also Gilmore v. Taylor, 508 U.S. 333, 342 (1993) (In non-capital cases, "we have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error. To the contrary, we have held that instructions that contain errors of state law may not form the basis for federal habeas relief."). The instruction cannot merely be "undesirable, erroneous, or even 'universally condemned.'" Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). It must violate a constitutional right. Id. The jury instruction "'may not be judged in artificial isolation,' but must be considered in the context of instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147). The Supreme Court has cautioned that there are few infractions that violate fundamental fairness. Id. at 72-73; see, e.g., Waddington v. Sarausad, 555 U.S. 179, 191-92 (2009); Middleton v. McNeil, 541 U.S. 433, 437 (2004) (per curiam) ("Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."); Jones v. United States, 527 U.S. 373, 390-92 (1999); Gilmore, 508 U.S. at 344.

This Court concludes that the state court's rejection of petitioner's jury instructional error claim was not contrary to, or an unreasonable application of, Supreme Court precedent. The Supreme Court has stated that a jury may consider a witness's level of certainty as a factor in evaluating the likelihood of misidentification. See Neil v. Biggers, 409 U.S. 188, 199-200 (1972); see also Manson v. Brathwaite, 432 U.S. 98, 114 (1977) (concluding that "reliability is the linchpin in determining the admissibility of identification testimony" and identifying certainty as a factor to consider); Perry v. New Hampshire, 565 U.S. 228, 239 n.5 (2012); Sexton v. Beaudreaux, 138 S. Ct. 2555, 2560 (2018) (per curiam). Relying on this precedent, federal courts have determined that the certainty factor in CALCRIM No. 315 does not violate due process. See Gonzalez v. Montgomery, No. CV 22-03313 MWF (RAO), 2022 WL 17345915, at *7 (C.D. Cal. Sept. 29, 2022) ("Given the fact that the Supreme Court has identified the certainty factor as one to be considered in evaluating the likelihood of misidentification, it stands to reason that instructing the jury with the certainty factor in CALCRIM No. 315 cannot violate due process."), report and recommendation adopted by 2022 WL 17340881 (C.D. Cal. Nov. 30, 2022); see also Nguyen v. Cates, No. CV22-2039 DOC (AS), 2023 WL 2248757, at *8-10 (C.D. Cal. Feb. 7,

2023), report and recommendation adopted by 2023 WL 2249949 (C.D. Cal. Feb. 27, 2023); Pope v. California, No. ED CV 21-1935-DOC (PLA), 2022 WL 3575415, at *11-14 (C.D. Cal. June 14, 2022), report and recommendation adopted by 2022 WL 16716211 (C.D. Cal. Nov. 4, 2022); Webb v. Holland, No. 2:16-cv-01368 TLN AC, 2019 WL 5595310, at *19- (E.D. Cal. Oct. 30, 2019), report and recommendation adopted by 2019 WL 7037575 (E.D. Cal. Dec. 20, 2019). Petitioner has failed to identify any Supreme Court precedent to support his theory.

Nor was the state court's conclusion objectively unreasonable. The instruction asked the jury to consider certainty as one of many factors in evaluating whether an eyewitness gave truthful and accurate identification testimony. (ECF No. 9-2 at 49-50.) The certainty factor was framed in neutral terms and did not require the jury to presume the accuracy of the identification. (Id. ("How certain was the witness when he or she made an identification?")) And the trial court instructed the jury that "[i]n evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of the testimony" including "[h]ow well could the witness see, hear, or otherwise perceive the things about which the witness testified?" (Id. at 46-47 (CALCRIM No. 226).) Petitioner has not identified anything in the record that demonstrates the eyewitness identification instruction so infected the trial that his conviction violated due process.

Lastly, even if the instruction was erroneous, petitioner has failed to prove that it had a "substantial and injurious effect or influence" on the jury's guilty verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); see also Brown v. Davenport, 142 S. Ct. 1510, 1524 (2022). As the state court noted, "Terrell's identification of MacDonald was corroborated by Gibson, who likewise identified MacDonald as the shooter, and further testified that they went to the homes of MacDonald's girlfriend or ex-girlfriend and sister after the shooting." (ECF No. 9-15 at 13; ECF No. 9-6 at 215; ECF No. 9-10 at 44-46.) Petitioner fails to explain how the verdict would have been different if the instruction had not included the credibility factor, or how this instruction relieved the prosecution of its burden to prove the identity of the perpetrator beyond a reasonable doubt. After careful review of the record, this Court concludes that the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, or that such a

finding was based on an unreasonable application of the facts and recommends denying habeas relief.

VI. Request for Judicial Notice

Petitioner also requests that this Court take judicial notice of the underlying state court record. (ECF No. 1 at 32.) Federal Rule of Evidence 201(b) provides that a federal court may take judicial notice of an adjudicative fact "that is not subject to reasonable dispute" if the fact "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Under this rule, courts may take judicial notice of "*undisputed* matters of public record," but generally may not take judicial notice of "*disputed* facts stated in public records." Lee v. City of Los Angeles, 250 F.3d 668, 690 (9th Cir. 2001). To the extent that petitioner disputes facts stated in the state court record, judicial notice would be improper. Nevertheless, because this Court can review the underlying lodged state court record in assessing petitioner's habeas petition (without taking judicial notice of it), this Court denies as moot petitioner's request for judicial notice.

VII. Conclusion

Accordingly, IT IS HEREBY ORDERED that petitioner's request for judicial notice (ECF No. 1) be denied as moot.

Furthermore, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus (ECF No. 1) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after

service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  July 11, 2023

*/s/ Kendall J. Newman*
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

TAA/macd0742.157